176 So. 360

**HARRIS et ux. v. HEARD et al.**

5 Div. 234.

Supreme Court of Alabama.

Oct. 7, 1937.

Rehearing Denied Oct. 28, 1937.

Jacob A. Walker, of Opelika, and Watkins C. Johnston, of Tuskegee, for appellants.

Powell & Powell, of Tuskegee, for appellees.

BOULDIN, Justice.

Appellants, W. J. Harris, better known as Wiley Harris, and his wife, Louisa Harris, filed their bill against appellees, Dr. C. R. Heard and others, praying relief in the nature of specific performance of a contract to convey real estate. The appeal is from final decree on pleadings and proof denying relief.

We endeavor to outline the controlling facts as we find them upon consideration of the pleadings, exhibits thereto, and testimony taken on oral examination before a commissioner, and noted by the register on the submission.

The instrument, executed June 13, 1919, made a basis of the relief sought, reads:

"Whereas, W. J. Harris is indebted to The Bank of Tuskegee in the sum of $984.-00 being the balance due on Note given by him to C. R. Heard on December 6, 1913, and secured by a mortgage on certain real estate in Tuskegee, Alabama, said mortgage being of even date and recorded in Book 110, page 42, Probate Office, Macon County, Alabama.

"Now in consideration of the aforesaid indebtedness and additional indebtedness of $288.46, being for money borrowed from said Bank to redeem a certain piece of property hereinafter described, from The Birmingham Trust and Savings Co. as Trustee in Bankruptcy of the estate of The Standard Home Co. and for the pur-

pose of paying fire insurance premiums on the above property.

"I, Jno. H. Drakeford, have agreed to act as trustee for said, The Bank of Tuskegee, and have had a deed executed to me by the said Birmingham Trust and Savings Co., to the following described property in Tuskegee, Macon County, Alabama.

"'All that part of Lot Number Twenty-one (21) of the Ansley's' Survey of the Town of Tuskegee on the South side of the Tuskegee Railroad, and being a part of what is known as the Haden lot, said Haden lot being fully described in deed executed by Thomas A. Harris and wife, to Wiley J. Harris on April 26, 1897, and recorded in Deed Book 5, at page 160, in the Probate office of Macon County, Alabama; lying and being in the town of Tuskegee, Macon County, Alabama.'

"It is agreed and understood that when the said indebtedness of $984.00 and the additional indebtedness of $288.46 both with interest is entirely paid by said W. J. Harris to The Bank of Tuskegee, I will execute to his wife, Louisa M. Harris, a quit claim deed to the last herein described property."

The parcel of land described fully in this instrument may, for our purposes, be sufficiently identified as that portion of lot 21 lying south of the Tuskegee Railroad, containing 2.3 acres.

In 1908, Harris and wife had executed a mortgage to Standard Home Company to secure a loan of $1,000. The mortgagee became a bankrupt, and the mortgage came to the hands of the trustee in bankruptcy, was duly foreclosed in 1917, and title passed to Birmingham Trust & Savings Company, trustee in bankruptcy. The two-year statutory right of redemption was about to expire in June, 1919, when the mortgagor applied to Mr. John M. Drakeford for aid in effecting a redemption. The mortgagor furnished part of the redemption money, stated by him at $600, and gave a note to Bank of Tuskegee for $288.46 due January 1, 1920, the further sum required to redeem and care for insurance premiums. Mr. Drakeford thereupon redeemed the land and took a deed to himself as recited in above-quoted instrument.

The further indebtedness of $984 due to Mr. Drakeford's bank, as recited in said instrument, originated in a loan by C. R. Heard to Wiley Harris of the sum of $800 in February, 1911, secured by mortgage on this same property, or a portion of

it to be hereinafter considered, and parcel known as Bethel Church lot. By this mortgage, the property was "warranted free from all incumbrances and any adverse claims." In fact, it was then incumbered by the prior recorded mortgage above mentioned.

On December 6, 1913, this Heard mortgage was renewed by a new note for $1,-000 and mortgage on the same portion of lot 21, but omitting the Bethel Church lot, and including a lot in Greenwood owned by Harris' sister, who joined in the execution of the mortgage.

This latter mortgage omitted the warranty of freedom from incumbrances, and instead provided for foreclosure at any time, "should the interest of said C. R. Heard or his assigns in said property become endangered by reason of the enforcement of any prior lien or incumbrance thereon, so as to endanger the debt hereby secured."

On December 9, 1913, three days after taking this renewal note and mortgage, C. R. Heard transferred same to Bank of Tuskegee, indorsing on the mortgage the following over his signature: "For value received, I do hereby bargain, sell and convey all my right, title, and interest in and to the within mortgage and property embraced therein, I hereby guarantee the payment of same to Bank of Tuskegee, Ala."

The note of Harris to the bank for $288.46 not being paid at maturity, January 1, 1920, nor the mortgage debt whose payment was guaranteed by Heard, he, on January 2, 1920, satisfied the bank in full; took a retransfer of the mortgage without recourse, and took a quitclaim deed from Mr. Drakeford to the lands deeded to him by the purchaser at foreclosure of the senior mortgage, viz.: All of lot 21 south of Tuskegee Railroad. This deed recited: "This deed is made subject to an agreement between John H. Drakeford and Wiley J. Harris, dated 13th day of June, 1919."

Thus matters stood until February 7, 1921, when Heard foreclosed his mortgage of December 6, 1913, under power of sale therein, and bid in the property at $1,462.-39, executing a deed by himself as mortgagee to himself as purchaser. The mortgage empowered the mortgagee to so purchase. The amount bid included the full amount of indebtedness due Heard, viz.: The balance on the mortgage debt with

interest, the note of $288.76 and interest, and the expenses of foreclosure.

The gravamen of the bill is that this mortgage covered only a portion of lot 21 south of the railroad, one acre, more or less, at the west end, separated from the eastern parcel by a roadway; that, upon the purchase of this one-acre parcel and the Greenwood lot for the full amount stipulated in the agreement with Mr. Drakeford, all further right, title, or interest in the parcel lying east of the alleged roadway was divested, and under the agreement with Mr. Drakeford, perpetuated in the transactions between him and Heard, complainants are entitled to have title thereto divested out of Heard and vested in Louisa Harris.

The bill invokes the obviously just equitable principle that, where the entire mortgage indebtedness is satisfied from a portion of the mortgaged property, the residue equitably belongs to the mortgagor, and the rule applies to any form of transaction having like equities.

The real inquiry is whether this rule is applicable upon a consideration of the whole case in the light of circumstances before and after the foreclosure of 1921.

The description in the mortgage of 1913, following that of 1911, so far as relates to lot 21, reads: "a parcel of land on which a house is now erected on what is known as part of lot no. 21, in said town and which is bounded as follows: On the north by the track of the Tuskegee R. R., on the West by land of R. A. Johnston, on the south by what is known as the 'Hooks lot', and on the east by road or street that runs between said lot or parcel of land hereby conveyed and a part of said lot of No. 21, containing one acre, more or less."

On the face of it this description calls for a road or street dividing the parcel mortgaged from the residue lying south of the railroad. It calls for one acre, while the entire lot south of railroad contained two or more acres. It calls for one house, when there were then three houses of a sort, on the entire lot.

Much evidence pro and con is offered touching the existence of such a road, and, if so, whether it can now be located so as to do equity, etc. We conclude from the evidence, including the mortgage itself, there was then a visible road or passway leading from a public street at east end of lot 21, running west along or near the south line, then turning northward to the residence occupied by Harris and tenants from its erection in 1904, as a means of ingress for vehicles and pedestrians to this, the house furthest west on the property as well as another house near it. It does not reasonably appear that this road extended on north to the railroad right of way. We further find this road may be reasonably located, or at least was not further east than the road now in use for like purposes. The mortgagor, who furnished this description to the draftsman, in our judgment, intended it to cover only the parcel west of this passway.

But it is not clear that this was the property intended at the time to be taken by the mortgagee as security for the loan of $800.

He testifies positively that he viewed the property, and the entire lot south of the railroad was pointed out to him by the mortgagor as the proposed security. It seems undisputed that he intrusted to the mortgagor the furnishing of the description to the draftsman. Other evidence strongly argues that he trusted the mortgagor as to the state of the title. The mortgage of 1911, as before noted, warranted the property free of incumbrances and all adverse claims.

In fact, there was an outstanding mortgage of record which was finally foreclosed as above discussed. There was also on record a deed of all this property from Harris to his wife, dated 1904, and recorded in 1910. It is easily inferable Heard would never have made the loan on the security as it was, if he had taken the pains to look into it.

We deem it probable at least that the loan was actually made without scrutinizing the description and under the impression that the mortgage conveyed a good title to the lot extending to the street or road lying east of lot 21.

Afterevents corroborate such view. The mortgagee concerned himself with getting the renewal mortgage of 1913, and required additional security, resulting in the mortgagor's sister joining in the mortgage and putting in her lot in Greenwood.

When this mortgage of 1913 came to the Bank of Tuskegee and remained unpaid for more than five years, Mr. Drakeford took occasion to strengthen the security through the transaction of which the document now in suit was a part.

By that transaction the title to the entire lot south of the railroad which had

passed under a senior mortgage, a title superior to the Heard mortgage, and to the deed from husband to wife, was taken over and charged with the payment of the Heard mortgage as well as the loan presently made by the bank. By the express terms of the agreement of June 13, 1919, above, the right to reclaim the title to this lot or any part of it was conditioned on payment of both debts. In a sense, this agreement wrote into the Heard mortgage the entire lot 21, south of the railroad as security for such debt.

It will be observed, the instrument in question did not negative a right to foreclose the Heard mortgage, nor to sue on the note for the present loan at its maturity January 1, 1920. When Heard took over the whole matter, including a deed, subject to the same agreement Drakeford had made with Harris, Heard stood in the shoes of Drakeford and his bank in all these matters.

Having taken all these steps to consolidate his security on the whole of lot 21, south of the railroad, Heard, in 1921, proceeded to foreclose the mortgage of 1913, and at the sale became the purchaser of the property sold at a price covering all the debt due him and costs of foreclosure. Because of this complainants insist that he is no longer entitled to retain the title held by deed to the fraction not within the description of the foreclosed mortgage.

That he intended thus to perfect his title to the whole lot south of the railroad subject to a statutory right of redemption, or right to reclaim under the Drakeford agreement of 1919, or both there seems to be no doubt.

He immediately, for the first time, demanded a surrender of possession of all the property. Harris was thus advised of his claim to the whole property. But, more important, he promptly delivered the possession of the whole property, not only recognizing Heard's claim to the whole, but admittedly so doing in order to perfect his statutory right of redemption.

Some twenty months after taking possession, Heard sold and conveyed to Carrie Bell Lewis a residence lot off the extreme east end of the parcel now sought to be reclaimed. She built a costly residence thereon.

Heard from year to year built and repaired other houses on the same parcel at a cost given by him at some $1,600. Shortly before suit filed he sold another lot,

which has been paid out and conveyed pending the suit.

All this has gone on with the full knowledge of complainants. They made no objection, sought no redemption, asserted no claim to the property until shortly before this bill was filed a few weeks before the expiration of ten years from the date of foreclosure, eleven and one-half years after the execution of the instrument they seek to enforce, and more than eleven years after the debt matured upon whose payment the right to reclaim the property depended. Nothing has ever been paid nor offered to be paid.

When all is said, Heard undertook to effectuate his entire security by an inapt method, a foreclosure under the power in the mortgage, instead of proceeding in equity. Complainants have acquiesced in, if not affirmatively ratified, such procedure. In effect, the parties have done for themselves what a court of equity would have done.

The wife had no higher right under the instrument of June 13, 1919, than her husband acquired thereunder for her. Any title by virtue of her deed had passed under the foreclosure of the senior mortgage.

After this long lapse of time, with intervening outlays, and incidents above recited, a court of equity should leave the parties where it finds them.

The decree of the trial court was in accord with these views and is due to be affirmed.

Affirmed.

ANDERSON, C. J., and GARDNER and FOSTER, JJ., concur.